OPINION OF THE COURT
Lewis J. Lubell, J.
This medical malpractice action is brought in connection with, among other things, personal injuries including brain damage, cerebral palsy, hemiparesis, blindness, and cognitive and developmental delays allegedly suffered by the infant plaintiff, Mario Emmanual Santana, during and directly after his birth.*
Currently before the court is the motion in limine of Paul S. Mayer, M.D., as joined in by codefendant Yessin Ashmawy, M.D., for an order precluding the introduction at trial of evidence or references to the administrative proceedings, findings and/or determination of the New York State Board for Professional Medical Conduct with respect to Mayer and his subsequent conviction for attempted unauthorized practice of medicine. For the reasons herein stated, the court grants the motion except to the extent that Mayer may be cross-examined for impeachment purposes with respect to the Board’s sustained specifications against Mayer for fraudulent practice (Education Law § 6530 [2]) and his conviction for attempted unauthorized practice of medicine, as is more fully set forth herein.
At all times relevant to the allegations underlying this action, including Sandra Torres’ prenatal care and the ensuing delivery in October 1997, Mayer was a board certified obstetrician/ gynecologist licensed as a physician in the State of New York since July 1976. At the time of this incident, Mayer, codefendant Yessin Ashmawy, M.D., and nonparty nurse midwife Laura Cross were employed by Hudson Valley Obstetrics & Gynecology, PC., a professional corporation owned by Mayer.
*508 Plaintiff Sandra Torres, the infant’s mother, contends that from August 1997 until the time of the infant’s delivery in October 1997 she had been leaking amniotic fluid. During that interval and during the course of the delivery at defendant St. Luke’s Hospital, Torres alleges to have been cared for by Paul S. Mayer, M.D. Torres claims that Mayer’s failure to have diagnosed and treated the leakage of amniotic fluid resulted in the injuries sustained by the infant. Torres also claims that her labor and the delivery of the infant were mismanaged in that, among other things, a cesarean section should have been performed.
As set forth at item “2” of the plaintiffs’ response to Mayer’s demand for a bill of particulars, the allegations of alleged negligence as to Mayer and Hudson Valley concern the prenatal care of Torres from April 8, 1997 through October 15, 1997 and the ensuing labor and delivery of the infant in October 1997 at defendant St. Luke’s Hospital. More particularly as set forth therein, plaintiffs claim that Mayer:
(1) failed to diagnose premature/prolonged rupture of the membranes during the plaintiffs prenatal visits;
(2) failed to treat oligohydramnios (inadequate amniotic fluid) caused by the premature/prolonged rupture of the membranes;
(3) failed to maintain proper medical records;
(4) failed to diagnose and treat fetal distress; and
(5) failed to perform a timely cesarean section.
In contrast to the position taken by plaintiffs with respect to Mayer’s participation in the care and treatment of Torres and the infant, Mayer contends that all medical care pertinent to this matter during August 1997 had been provided by the midwife and, thereafter, solely by codefendant Ashmawy.
In anticipation of having to testify at trial to address, among other things, the material questions of fact as to whether and to what extent he was involved with the care and treatment of Torres and the delivery of the infant, Mayer brings this motion in connection with the September 15, 2000 determination of the Board to revoke his medical license following a five-day hearing conducted pursuant to the provisions of section 230 (10) of the Public Health Law and sections 301-307 and 401 of the State Administrative Procedure Act. In connection therewith, the Board received evidence concerning 15 “specifications” of Mayer’s alleged violations of section 6530 of the Education Law concerning the medical care and treatment provided by Mayer *509 to three of his patients, identified therein as patients “A,” “B” and “C,” during the period from 1995 through 1997, neither of whom were Torres or the infant. The hearing was conducted between April 12, 2000 and June 13, 2000.
The 15 specifications alleged gross negligence (Education Law § 6530 [4]), gross incompetence (Education Law § 6530 [6]), negligence (Education Law § 6530 [3]), incompetence (Education Law § 6530 [5]), failure to keep adequate patient records (Education Law § 6530 [32]), fraudulent practice (Education Law § 6530 [2]), conduct which evidences moral unfitness (Education Law § 6530 [20]), and the inappropriate delegation of professional responsibilities (Education Law § 6530 [25]).
The specifications included allegations that: on July 12, 1995, Mayer performed a hysterectomy without the benefit of a frozen section study intraoperatively (laboratory evaluation for the presence of cancer cells), thereby causing the sterility of the patient where subsequent pathology reports showed no cancer; and, on June 11, 1997, Mayer performed a voluntary termination of a pregnancy (abortion) of a fetus at the 26 to 28 week gestational age without having first clinically or diagnostically established the correct gestational age of the fetus, thereby resulting in an illegal abortion. With respect to the latter determination, the Board concluded that Mayer made false statements to other medical care providers about the source of the patient and the presence of fibroids.
Upon completion of the hearing, the Board “found numerous violations of accepted standards of medicine and each violation constituted either gross negligence or gross incompetence” such as to form the basis for the Board’s revocation of Mayer’s license (Matter of Mayer, 2000 WL 35364496 [2000]). Revocation was deemed appropriate even though the specifications relating to patient “C” were not sustained, “the most serious acts, those associated with patient ‘A’, [had] happened 3 years [before their determination and those] acts associated with Patient ‘B’ [had taken] place 5 years [before their determination]” (id.). The Board further justified license revocation by noting, “Not only did Respondent practice grossly substandard medicine, he lied about it then and he continues to lie about it today.” (Id.) In that regard, the Board further found:
“[Mayer] refuses to admit he lied to the hospital staff about the referral of Patient A and the alleged performance of the non-existing sonogram. The Committee could be more lenient with a practitioner *510 who, in the heat of catastrophe, makes representations that are false. Yet Respondent continues to defend the indefensible.” (Matter of Mayer, supra.)
The revocation of Mayer’s medical license was temporarily stayed pending his appeal of the Board’s determination to the Appellate Division, Third Department. The stay was subsequently vacated, and then reinstated. By decision dated November 29, 2001, the Appellate Division, Third Department, reversed and annulled the Board’s determination (see Matter of Mayer v Novello, 288 AD2d 780 [3d Dept 2001] [determination annulled due to improperly constituted hearing committee; remitted for a new hearing before a properly constituted one]) and remitted the matter for a de novo hearing. Following an appeal of the Appellate Division determination, the Court of Appeals reversed and remitted the action to the Appellate Division to consider the balance of the issues initially raised on appeal (Matter of Mayer v Novello, 99 NY2d 180 [2002]). By decision dated March 27, 2003, the Appellate Division confirmed the Board’s determination revoking Mayer’s medical license (Matter of Mayer v Novello, 303 AD2d 909 [3d Dept 2003]).
In the meantime, on February 12, 2002, Mayer was indicted and charged with the unauthorized practice of medicine in violation of section 6512 (1) of the Education Law, a class E nonviolent felony. More specifically, Mayer was charged with having practiced medicine without a license from November 24 to December 1, 2000 and on April 12, 2001 and June 9, 2001 while his license had been revoked. The asserted periods followed Mayer’s license revocation, the stay of the revocation, but then the reinstatement of the license revocation pending the Appellate Division’s determination of the appeal.
The County Court of the County of Orange (DeRosa, J.) dismissed the indictment upon its finding that Mayer had not received adequate notice that the stay had been lifted. The Appellate Division, Second Department, reversed the determination and reinstated the indictment finding that the evidence before the grand jury was sufficient to sustain the charge (People v Mayer, 1 AD3d 461 [2003]). Thereafter, in April 2004, Mayer entered a plea of guilty to one count of attempted unauthorized practice of medicine in violation of Penal Law § 110.00 and section 6512 of the Education Law, an unclassified misdemeanor, putting to rest any notice issues that Mayer could have raised at trial.
*511 “A general rule of evidence, applicable in both civil and criminal cases, is that it is improper to prove that a person did an act on a particular occasion by showing that he did a similar act on a different, unrelated occasion” (Matter of Brandon, 55 NY2d 206, 210-211 [1982] [citation omitted]). Certain exceptions to this rule, none of which are advanced here, have been recognized where, for example, the evidence of other similar acts is offered to help establish motive, intent, absence of mistake or accident, a common scheme or plan, or identity (Matter of Brandon at 211, citing People v Molineux, 168 NY 264, 293 [1901]).
As such, Mayer’s application to preclude the introduction at trial of evidence or references to the administrative proceedings, findings or determination of the New York State Board for Professional Medical Conduct is granted to the extent that such proceedings, findings and determination relate to the sustained specifications of gross negligence, gross incompetence, negligence, incompetence, and the failure to keep adequate patient records.
However, keeping in mind “the elementary premise that impeachment is a particular form of cross-examination whose purpose is, in part, to discredit the witness and to persuade the fact finder that the witness is not being truthful” (People v Walker, 83 NY2d 455, 461 [1994], citing Fisch, New York Evidence § 447 [2d ed]), the court concludes that, upon cross-examination of Mayer, reference may be made to the administrative proceedings, findings and determination of the Board to the extent said administrative proceedings, findings and determination relate to the sustained findings of fraudulent practice (Education Law § 6530 [2]) as were sustained in connection with the 11th and 12th specifications of the Board’s determination. More particularly, as to specification 11, the Board found that, with the purpose of attempting to reduce his own responsibility, Mayer falsely represented to other medical personnel that a patient had been referred to him by another doctor so as to have hospital medical staff believe that he had come upon the patient when she was already in distress, rather than having to take the responsibility for the truth of his actions. As to specification 12, the Board found that Mayer represented to hospital medical staff that a sonogram had been performed on a patient, when he knew that such was not true in an attempt to reduce his culpability.
“ ‘[Practicing the profession fraudulently’ involves the intentional misrepresentation or concealment of a known fact *512 without the requirement that the fraud caused an injury to a patient or a benefit to the doctor” (Matter of Mayer v Novello, 303 AD3d at 910, citing Matter of Schwalben v DeBuono, 265 AD2d 609, 611 [3d Dept 1999]; Matter of Sung Ho Kim v Board of Regents of Univ. of State of NY., 172 AD2d 880, 881-882 [3d Dept 1991], lv denied 78 NY2d 856 [1991]). Whether or not the sustained findings of fraudulent practice constitute prior immoral, vicious or criminal conduct bearing on credibility, they may properly be used for impeachment purposes since, at the very least, they demonstrate an untruthful bent or willingness or disposition on Mayer’s part to voluntarily place his own self-interest and advancement ahead of principle or the interests of society (People v Walker at 461, citing People v Coleman, 56 NY2d 269, 273 [1982] and People v Sandoval, 34 NY2d 371, 377 [1974]). “[T]he commission of crimes involving individual dishonesty, such as theft, fraud and forgery demonstrate [one’s] . . . willingness to place [his] own interests ahead of the interests of society, thereby impacting directly upon the issue of . . . credibility” (People v Young, 178 AD2d 571, 571-572 [2d Dept 1991] [internal quotation marks omitted], quoting People v Ortiz, 143 AD2d 107 [2d Dept 1988]). The Board’s sustained finding against Mayer of fraudulent practice is no different.
Any consideration of the passage of time since the 2000 administrative proceedings, findings and determination and/or the 1995 to 1997 commission of the facts thereunder are sufficiently outweighed by the seriousness and relevancy of the upheld specifications and their proximity in time to the acts herein alleged.
The court now turns its attention to the one remaining question: whether and to what extent Mayer’s conviction for attempted unauthorized practice of medicine and/or the facts thereunder may be employed at trial.
For the reasons that follow, the court concludes that Mayer may be cross-examined with respect to the existence of his conviction upon his plea of guilty for attempted unauthorized practice of medicine and the underlying facts thereof.
In contrast to early common law under which the testimony of a convicted criminal was rendered incompetent, CPLR 4513 provides as follows:
“A person who has been convicted of a crime is a competent witness; but the conviction may be proved, for the purpose of affecting the weight of his testimony, either by cross-examination, upon *513 which he shall be required to answer any relevant question, or by the record. The party cross-examining is not concluded by such person’s answer.”
The authority granted to a civil litigant under CPLR 4513 to use an adverse witness’ criminal convictions to impeach his or her credibility is “broad” (Vernon v New York City Health & Hosps. Corp., 167 AD2d 252 [1st Dept 1990], citing Abie Cycle Engines v Allstate Ins. Co., 84 AD2d 140, 142-143 [1981], lv denied 57 NY2d 607 [1982]). “Under CPLR 4513, [both the] conviction of a crime and the underlying facts of the criminal acts may be used to impeach the credibility of a witness at a civil trial” (Dance v Town of Southampton, 95 AD2d 442, 452-453 [2d Dept 1983], citing Moore v Leventhal, 303 NY 534 [1952] and Able Cycle Engines v Allstate Ins. Co., supra). “While the nature and extent of such cross-examination is discretionary with the trial court . . . , the inquiry must have some tendency to show moral turpitude to be relevant on the credibility issue” (Badr v Hogan, 75 NY2d 629, 634 [1990], citing Langley v Wadsworth, 99 NY 61, 63-64 [1885], People v Montlake, 184 App Div 578, 583 [2d Dept 1918], Richardson, Evidence § 499 [Prince 10th ed] and Fisch, New York Evidence § 455 [2d ed]; see also Acunto v Conklin, 260 AD2d 787, 789-790 [3d Dept 1999] [within the sound discretion of Supreme Court to control the manner of presentation of proof at trial especially when dealing with matters affecting a witness’ credibility and accuracy]). Certainly, one’s status as a physician is of no moment (see Spanier v New York City Tr. Auth., 222 AD2d 219, 220 [1st Dept 1995] [proper for trial court to allow defense to ask plaintiff’s treating physician about prior allegations of improper billing, and other misconduct, since those allegations had a bearing on the doctor’s credibility]).
Subdivision (1) of section 6512 of the Education Law provides, in pertinent part:
“Anyone not authorized to practice under this title who practices or offers to practice or holds himself out as being able to practice in any profession in which a license is a prerequisite to the practice of the acts, or who practices any profession as an exempt person during the time when his professional license is suspended, revoked or annulled . . . shall be guilty of a class E felony.”
Mayer’s conviction for attempted unauthorized practice of medicine, an unclassified misdemeanor, and the facts thereun *514 der are highly relevant on the issue of Mayer’s credibility and sufficiently demonstrate his “willingness to deliberately further his self-interest at the expense of society” (People v McAleavey, 159 AD2d 646, 646 [2d Dept 1990]). In addition, the conviction is not so remote in time as to be precluded.
Codefendant’s cross motion is denied except to the extent herein granted in connection with Mayer’s motion.
The rulings herein made will necessarily be the subject of limiting instructions to the jury as to how they relate to Mayer and/or the other defendants including Dr. Ashmawy.

 The action has since been dismissed as against defendant Prabhakar Kocherlakota, M.D.