OPINION OF THE COURT
Jack M. Battaglia, J.
In this medical malpractice action commenced by plaintiff Starkema Yarborough, defendant Robert V Cattani, M.D. moves “to preclude plaintiffs counsel from introducing any evidence, at time of trial, regarding the action by the N.Y.S. Department of Health, Office of Professional Medical Conduct . . . which resulted in revocation of Dr. Cattani’s medical license.” (See mem of law submitted in support of defendant’s motion in limine at 2.) The reference is to a determination and order dated September 10, 2012 of a Hearing Committee of the State Board for Professional Medical Conduct that was affirmed in April 2013 by the Administrative Review Board for Professional Medical Conduct. Although Dr. Cattani has challenged the determination before the Appellate Division, Third Department, there is no stay of the license revocation {see Public Health Law § 230-c [5]).
In her verified complaint, plaintiff alleges professional negligence in connection with breast augmentation surgery performed in November 2008; specifically, the
“breast augmentation procedure, pre-operative examination, diagnoses, treatment and related follow-up care was improperly and inadequately performed in that defendant made incisions in improper locations; failed to properly place breast implants in plaintiff’s body; failed to create adequate implant pockets; failed to follow plaintiff’s instructions and used oversized implants that were over filled.” (Verified complaint ¶¶ 5-7.)
In her verified bill of particulars, plaintiff expands upon these *787 allegations, alleging specifically that defendant “fail[ed] to advise plaintiff that he was not a board certified surgeon or board certified plastic surgeon and lacked the requisite professional expertise, training, skill and qualifications to perform breast augmentation surgery,” and “fail[ed] to keep and maintain accurate and complete medical records.” (See verified bill of particulars ¶ 5.)
The proceedings before the State Board were commenced with a notice of hearing and a statement of charges, both dated November 2, 2011. The charges were based on Dr. Cattani’s surgery and treatment for five patients at times in 2005, 2006, 2007 and 2010. The determination and order summarized the charges levied by the Bureau of Professional Medical Conduct as petitioner, as follows:
“Petitioner charged Respondent, a physician practicing cosmetic surgery, with twelve (12) specifications of professional misconduct. The first through fifth specifications charged Respondent with committing professional misconduct as defined in NY Educ. Law § 6530 (4) by by [sic] practicing the profession of medicine with gross negligence on a particular occasion for each of the five named patients.
“In the sixth specification, Respondent was charged with committing professional misconduct as defined in NY Educ Law § 6530 (3) by practicing the profession of medicine with negligence on more than one occasion for each of the five named patients. In the seventh specification, Respondent was charged with committing professional misconduct as defined in NY Educ Law § 6530 (5) by practicing the profession of medicine with Incompetence [sic] on more than one occasion with regard to each of the five named patients. In the eighth through the twelfth specifications Respondent was charged with committing professional misconduct as defined in NY Educ Law § 6530 (32) by failing to maintain a record for patients A, B, C, and D which accurately reflects the care and treatment of the patient in question.” (Determination and order at 3.)
The Hearing Committee used the following “definitions” in reaching its determinations:
“Gross Negligence is negligence that is egregious, i.e., negligence involving a serious or significant deviation from acceptable medical standards that *788 creates the risks of potentially grave consequence to the patient . . . Gross Negligence may consist of a single act of negligence of egregious proportions, or multiple acts of negligence that cumulatively amount to egregious conduct ... A finding of gross negligence does not require a showing that a physician was conscious of impending dangerous consequences of his or her conduct.
“Negligence is the failure to exercise the care that would be exercised by a reasonably prudent licensee under the circumstances.
“Incompetence is a lack of the skill or knowledge necessary to practice the profession.” (Determination and order at 24-25.)
The Committee sustained all of the charges except as they related to one of the patients who did not testify at the hearing. As to the other four patients, only one, designated “Patient D,” had breast augmentation surgery. The Committee concluded that Dr. Cattani had “committed sufficiently egregious misconduct that is worthy of the revocation of his medical license.” 0See determination and order at 40.)
In Cipriano v Ho (29 Misc 3d 952 [Sup Ct, Kings County 2010]), this court considered the admissibility or use of professional misconduct findings in a malpractice action against the disciplined doctor. There, the State Board for Professional Medical Conduct found the defendant doctor guilty of professional misconduct for practicing the profession with negligence on more than one occasion, but rejected charges of practicing the profession with incompetence on more than one occasion. (See id. at 953.)
Considering the admissibility of the findings as evidence-in-chief on the plaintiffs claim, after review of the little case law available, the court
“ assume [d] that, if otherwise properly rendered admissible as evidence (see CPLR 4540), had the Hearing Committee and ARB written determinations here concerned [the defendant doctor’s] treatment of plaintiff, the findings of fact contained therein, but not the opinions or conclusions of law, would be admissible as presumptive evidence of those facts.” (See Cipriano v Ho, 29 Misc 3d at 958.)
But findings of negligent acts of a malpractice defendant that are unrelated to the plaintiffs case would be marginally relevant at best and likely to unduly prejudice the jury. (See id.) In *789 refusing admissibility under such circumstances, the court noted the general rule of evidence that “it is improper to prove that a person did an act on a particular occasion by showing that he did a similar act on a different, unrelated occasion.” (See id., quoting Matter of Brandon, 55 NY2d 206, 210-211 [1982].)
Considering whether the medical malpractice plaintiff may seek to impeach a defendant doctor with questioning regarding disciplinary action taken against the doctor, after review of the little case law available, the court concluded that the fact alone of disciplinary action against a physician did not appear sufficient to permit its use on cross-examination, but rather the underlying findings and determinations must be probative on the issue of credibility and weighed as such against the possibility of prejudice. (See Cipriano v Ho, 29 Misc 3d at 959-960.) For probative value, the findings or conclusions must reveal “a willingness or disposition” on the doctor’s part “to place the advancement of his individual self-interest ahead of principle or of the interests of society.” (See id. at 961, quoting People v Walker, 83 NY2d 455, 461 [1994].) For there to be “undue prejudice,” there must be more than “the expected—and, indeed, intended—negative impact that naturally flows from evidence admitted for the purpose of impeachment.” (See id., quoting People v Walker, 83 NY2d at 463.)
On the questions of both admissibility as evidence and impeachment, this case differs from Cipriano v Ho (29 Misc 3d 952 [2010]). Here, in addition to findings as to negligence, the Board also sustained charges of incompetence; and, as this court pointed out in Cipriano, a distinction between incompetence and negligence is recognized in the law governing professional medical conduct (see id. at 957, citing Matter of Dhabuwala v State Bd. for Professional Med. Conduct, 225 AD2d 209, 213 [3d Dept 1996]). However, professional incompetence does not exist “at large,” but rather with respect to particular matters of knowledge and skill. (See Darren v Safier, 207 AD2d 473, 475 [2d Dept 1994] [gastroenterologist not required to exercise skill and care of psychiatrist].)
Here, as previously noted, Dr. Cattani had performed breast augmentation surgery only on “Patient D.” The Hearing Committee’s findings as to Dr. Cattani’s incompetence as to Patient D were:
“As for Patient D, the testimony at the hearing clearly established that from the time she returned home after surgery she noticed that her left breast *790 was red and inflamed and was causing excruciating pain. This patient called Respondent’s office the next day and Doctor Cattani did not respond. It was the receptionist, Donna, who responded to the patient and told her it was probably nothing to worry about and to continue with antibiotics and pain medication. The delegation of care in this case to untrained office staff was evidence of the Respondent’s incompetence, to say the least. A surgeon must personally examine the patient within the first few days after surgery or at a minimum have a registered nurse with appropriate experience evaluate the patient. Examination of a patient by only an untrained medical assistant fell far below the standard of care.” (Determination and order at 36-37.)
Assuming that incompetence in 2010, when Dr. Cattani performed a breast augmentation procedure on Patient D, would be probative of incompetence in 2008, when he performed plaintiff’s procedure, the court sees no necessary relationship between improper delegation of postoperative care to untrained office staff and Dr. Cattani’s competence as defined by the Committee as skill and knowledge. And, as previously noted, a failure to provide the “standard of care,” i.e., negligence, is legally distinct from a lack of the requisite competence. There is no finding that Dr. Cattani did not possess the knowledge or skill to perform breast augmentation surgery.
As to use of the Board’s findings for purposes of impeachment, this case differs from Cipriano v Ho (29 Misc 3d 952 [2010]) in that in Cipriano there was no question of the plaintiff’s attempting to impeach the defendant doctor when he testified on the plaintiffs direct case as the plaintiffs witness (see id. at 961). Although it is not always clear from the case law, this court is confident that, if Dr. Cattani testifies on plaintiff’s direct case, she may not seek to impugn his credibility generally with any of the Board’s findings (see Marzuillo v Isom, 277 AD2d 362, 363 [2d Dept 2000]; see also Spampinato v A. B. C. Consol. Corp., 35 NY2d 283, 287 [1974]; Cross v Cross, 108 NY 628, 629 [1888]; Becker v Koch, 104 NY 394, 401 [1887]; Jordan v Parrinello, 144 AD2d 540, 541 [2d Dept 1988]).
Although courts on occasion state that “[t]he general rule prohibiting a party from impeaching his or her own witness . . . does not apply where the party is an adverse party” (see Williams v Brosnahan, 295 AD2d 971, 972 [4th Dept 2002]; Cammarota v Drake, 285 AD2d 919, 920 [3d Dept 2001]), those *791 courts were presented with “impeachment” by the introduction of contradictory evidence, and “impeachment is not to be confused with ‘binding’ testimony” (see Spampinato v A. B. C. Consol. Corp., 35 NY2d at 287, citing Becker v Koch, 104 NY 394 [1887]). The adverse party may also be impeached by the party’s contradictory statements made out of court (see Kelly v Wasserman, 5 NY2d 425, 427-428 [1959]; see also CPLR 4514; Ferri v Ferri, 60 AD3d 625, 625-626 [2d Dept 2009]).
Any restriction on plaintiff’s ability to impeach defendant generally as to credibility will disappear if defendant testifies in his own behalf or on cross-examination beyond the scope of plaintiffs direct (see Austin v Bartlett, 178 NY 310, 313 [1904]; Mitnick v Nassau Elec. R.R. Co., 138 App Div 576, 578 [2d Dept 1910]). In that event, plaintiff will be permitted to impeach defendant with findings of the Board that are sufficiently probative of his credibility without being unduly prejudicial.
The Board’s determination and order contains a number of statements as to Dr. Cattani’s credibility in general and the reliability of his records:
“The Hearing Committee did not believe the testimony of Dr. Cattani and found it to be false and self-serving. The panel found that Dr. Cattani had every reason to testify inaccurately and to author inaccurate records, and the panel determined, unanimously, that that is exactly what he did. Thus, the panel did not believe Dr. Cattani.” (Determination and order at 29.)
“The Respondent was charged with professional misconduct as defined in NY Educ Law § 6530 (32) for failing to maintain records for his patients which accurately reflect the care and treatment of his patients. Specifications eight through eleven dealt with the care of patients A, B, C, and D.
“The panel, unanimously sustained these specifications for these patients, noting that the records appeared fabricated and prepared after the fact, presumably for litigation. The panel found it hard to believe that these were accurate patient records maintained in a regular, on-going, medical practice. As medical records, the documentation for these patients was not credible and, in several instances was contradicted by the testimony of the patient themselves, who [sic] the panel found highly credible and persuasive.” (Determination and order at 37.)
*792 “As for Patient B, the panel noted that the records of the Respondent are contradicted by the testimony of the patient . . . The panel found Patient B to be highly credible and the Respondent completely lacking in credibility.” (Determination and order at 37-38.)
“As for Patient D, the panel found similar glaring inaccuracies and false statements. The record indicates that the Respondent saw Patient D on March 8. The record for Patient D was directly contradicted by the patient’s testimony indicating numerous phone calls made to the Respondent’s office complaining of severe pain which were not answered. The panel found the testimony of Patient D to be credible and the medical records kept by the Respondent to be false and inaccurate. . . .
“The questioning of Patient D by the panel . . . establishes the fact that the Respondent fabricated the record for his own purpose and the record was not at all reflective of the actual treatment of his patient. The panel found that this record falls below the standard for accuracy and honest reporting that is essential for a medical record and was quite concerned that conversations reported in this record never took place.” (Determination and order at 38-39.)
General statements as to Dr. Cattani’s credibility constitute opinions of the members of the Hearing Committee, and they cannot be used as “facts” found by the Board. (See Cipriano v Ho, 29 Misc 3d at 958.) Statements that Dr. Cattani’s records as to those patients were inaccurate, or even “false,” might qualify as factual findings, but they are not shown to be related to Dr. Cattani’s record keeping as to plaintiff or even the time period of her surgery (see id.), and, in any event, are not sufficiently probative of Dr. Cattani’s credibility at trial.
Of a different nature, however, are the statements that “Dr. Cattani had every reason to testify inaccurately and to author inaccurate records, and . . . that is exactly what he did”; and the statements as to Patient D’s record that Dr. Cattani “fabricated the record for his own purposes,” and that the record “falls below the standard for . . . honest reporting.” These statements can be fairly understood as a finding that Dr. Cattani purposely fabricated medical records on more than one occasion. As such, the statements are highly probative as to cred *793 ibility. The statements are clearly prejudicial, but not unduly so, particularly since Dr. Cattani is free to address them upon questioning by his counsel. In any event, whenever elicited, the Board’s findings should be accompanied by the court’s instruction to the jury as to the limited use to which the jury may make of the information (see e.g. NY PJI 1:66 and Comment).
In sum, defendant’s motion in limine is granted, except to the extent that the quoted findings as to the fabrication of records may be used by plaintiff for impeachment in accordance with this opinion.